```
                    *******************
```
```
                           OF
```
8
```
                    SWORN STATEMENT
                           OF
```
9
```
                     JOSHUA FIELDS,
                    *******************
```
10

11

12

13

14

15  taken on behalf of the Insurance Company before a

16  Certified Shorthand Reporter of Oklahoma at 1324 East
    Grand Avenue, Ponca City, Kay County, Oklahoma, on

16  Thursday, March 18, 2021, starting at 10:05 a.m.

17

18

19

20

21                       REPORTED BY:

22

23                  Sonya Kay Meneely, CSR
                    SCRIBE REPORTING SERVICES
                       WWW.OKREPORTERS.COM

24

25                       EXHIBIT 1

1                    A P P E A R A N C E S:

2

3

4

5   THE WITNESS APPEARED BY HIS COUNSEL:

6           Mr. Scott R. Jackson

7           Martin, Jean & Jackson

8           1324 East Grand Avenue

9           Ponca City, Oklahoma   74601

10

11

12

13   THE INSURANCE COMPANY APPEARED BY ITS COUNSEL:

14           Mr. Michael S. Linscott

15           Doerner, Saunders, Daniel & Anderson

16           William sCenter Tower II

17           Two West Second Street, Suite 700

18           Tulsa, Oklahoma  74103

19

20

21

22

23

24

25

3

1                          I N D E X

2

3   WITNESS                                    PAGE

4   JOSHUA FIELDS

5        Examination by Mr. Linscott              4

6

7

8   EXHIBITS MARKED

9        No. 1 - nine-page Limited

10  Multi-Peril Survey                           8

11

12

13

14

15

16

17

18  CERTIFICATE OF CERTIFIED SHORTHAND REPORTER    49

19

20

21

22

23

24

25

4

1                              JOSHUA FIELDS,

2      of lawful age, having been first duly sworn on his oath

3      to state the truth, and nothing but the truth, states

4      as follows:

5                              EXAMINATION

6      BY MR. LINSCOTT:

7           Q.   Okay.  Mr. Fields, if you would state your

8      full name for the record.

9           A.   Joshua Charles Fields.

10          Q.   Okay.  And we've already established you are

11     not the Josh Fields that beat OU a few years ago --

12          A.   No, sir.

13          Q.   -- as quarterback.

14               All right.  My name is Mike Linscott and I'm

15     here representing the insurance company that had the

16     insurance on the property that is at issue that burned.

17     Okay?  And that's what we're here to talk about today.

18     Do you understand that?

19          A.   Yes, sir.

20          Q.   Okay.  And this is an examination under oath

21     so you've been sworn in to tell the truth just as if

22     you were in front of a judge and a jury.  Right?

23          A.   Yes, sir.

24          Q.   Okay.  And this -- we think we established

25     this off the record, but there is not a lawsuit filed

5

```
 1    at this time by you against the insurance company or
 2    others related to this fire.  Is that correct?
 3        A.   I believe that's correct.  Yes.
 4        Q.   Okay.  All right.  I'm going to ask you some
 5    questions and try to get very focused to just things
 6    about the policy and the event, you know, with the
 7    building in question and so forth.
 8             If I ask you something that you don't
 9    understand, or more likely I don't make very clear, ask
10    me to clarify it.  Is that okay?
11        A.   Okay.
12        Q.   And if you do that -- otherwise, we'll assume
13    you understood the question when you answer it.  Okay?
14        A.   (Affirmative head nod.)
15        Q.   And you'll have to say yes or no.
16        A.   Yes.  I'm sorry.  I'm sorry.
17        Q.   Hard to do.
18        A.   I get it.  I get it.
19        Q.   And sometimes this may wind up being like
20    conversation, but it's tough on the court reporter and
21    we need to have a good record for this.
22        A.   Can't hear my head rattle.  I get it.
23        Q.   Well, yeah.  We just have to say something and
24    it can't be uh-huh, huh-uh.  Yes or no.
25        A.   Yes.
```

6

1        Q.   And then I need to let you finish, okay,

2   before I start asking a question.  And if you'll show

3   the same courtesy to me, again, that will help the

4   court reporter.  Is that okay?

5        A.   Yes.

6        Q.   All right.  The Examination Under Oath, I'll

7   just tell you from our perspective is pursuant to the

8   policy.  It's your cooperation, you know, with

9   assisting us in trying to determine coverage that you

10   have.  Do you understand that?

11        A.   Yes, sir.

12        Q.   All right.  And I do appreciate you being here

13   today.

14             Okay.  The policy in question, do you know how

15   long you've had that policy on that property?

16        A.   That policy?  I mean, I don't really know how

17   insurance policies work, but I had insured it when I

18   bought it through Zac Swords, and then he sold his

19   insurance policies to somebody in Tonkawa, or Randall

20   or something.  And I think that -- so I'd had it for as

21   long as I'd owned the building.

22        Q.   And how long -- when did you buy the building?

23   Do you recall?

24             THE WITNESS:  Scott, we talked about that

25   the other day.  What did I tell you?  2010 or '11

1    maybe?

2    BY MR. LINSCOTT:

3        Q.   And look.  This is just to the best of your

4    knowledge.  I know that there may be some records that

5    we could look at and I know we have something on it.

6    I'm just trying to see what you know now.

7        A.   Yeah.

8        Q.   And then if you don't know --

9        A.   I don't know.

10       Q.   -- then don't hesitate to say that.

11       A.   I don't know for sure.

12       Q.   Okay.  All right.  There was a -- do you

13   recall having an inspector with someone called Reliable

14   Inspections contact you back in 2015 about the

15   building, about inspecting the building and asking you

16   some questions about that?

17       A.   I don't recall that.  I know that I have had

18   inspectors from time to time to rental properties, yes.

19       Q.   Okay.  And so -- okay.  Well, I'm going to

20   show you a report here in just a minute from that.  But

21   I was just wondering if you happen to remember that,

22   where they were -- where the inspector was looking at

23   and asking questions of whether or not you had any type

24   of fire protection device or devices in the building.

25   Do you recall that better now?

8

1      A.    No.

2                    MR. LINSCOTT:   Okay.   All right.   Let's

3    mark one thing here as an exhibit here.   Let me find it

4    first.   Okay.   I've just got two of these, so I'm going

5    to let you look at it and then let me mark this one.

6                    (Exhibit Number 1 was marked for

7                    identification.)

8                    MR. JACKSON:   Okay.   Take a look at that

9    real quick.   Can we make another copy?   Do you mind?

10                   MR. LINSCOTT:   I don't mind a bit.

11                   (An off-the-record discussion was here had,

12                   followed by a brief recess.)

13   BY MR. LINSCOTT:

14     Q.    Okay.   Well, let's go back on the record.

15            All right.   I handed you what is marked as

16   Exhibit 1 to your Examination Under Oath and I'll just

17   tell you the title of it.   It was generated by a

18   company called Reliable Reports of Texas.   I think I

19   said Reliable Inspections.   My apologies.   It's called

20   a Limited Multi-Peril Survey.   And you've had a chance

21   to look it over?

22     A.    Yes.

23     Q.    Okay.   I'll ask you a few questions.   But

24   first off, the front page of it, it has a For

25   Completion by the Insured.   Do you see that?

9

```
 1        A.   It says what now?

 2        Q.   In the middle of the page it says --

 3        A.   Oh, yeah.

 4        Q.   Do you see that?

 5        A.   Yeah.

 6        Q.   And it has a part where printed name is Josh

 7   Fields?

 8        A.   Yes.

 9        Q.   Do you recall printing your name in there?

10        A.   I don't think I printed that, but ...

11        Q.   Okay.  Is the signature on here your

12   signature?

13        A.   It looks like it could be, yes.

14        Q.   Well, I need to know if it is or not.

15        A.   Yes, sir.  Yes.

16        Q.   Okay.  If it's not, someone else did it and I

17   need to know who that was.  But anyway, if it's your

18   signature just ...

19        A.   It resembles my signature.

20        Q.   Okay.  Do you --

21        A.   But I don't remember it and my signature may

22   have changed a little over the last six years.

23        Q.   Okay.  Do you recall reviewing this and then

24   signing it, recognizing what it says in here, that it

25   says:  Certified that all required recommendations
```

1    found during the recently-conducted inspection have

2    been fully complied with as of July 23, 2015.

3            Do you recall reading this and signing that?

4        A.   Do I recall, no.  But do I remember an

5    insurance, yes.

6        Q.   Okay.  Do you recall -- does this help or

7    maybe you had -- excuse me.  Not maybe -- that you had

8    a phone call with a Jack McNeal of RRI here, Reliable

9    Reports, about your building back in July of 2015?

10       A.   No.

11       Q.   Okay.  If he was to indicate that he had such

12   a phone call with you, do you think he'd be mistaken in

13   some way?

14       A.   No.  I don't think that he'd be mistaken.  I

15   just don't recall a phone conversation.

16       Q.   Okay.  All right.  It says the property

17   location is 410 West Cleveland.  Is that the property

18   that you've got the claim on?

19       A.   That's correct.

20       Q.   Okay.  And is it fair to say that's an

21   apartment building?

22       A.   Yes, sir.

23       Q.   Okay.  If you'll turn in to this about three

24   pages or so, four I guess it is, there is some

25   pictures.  Do you see those?

11

1      A.   Yes.

2      Q.   Okay.  I want to make sure we're talking about

3  the same building.

4      A.   That's it.

5      Q.   Is that it?  Okay.  And then it looks like a

6  front and a back view.  Is that correct?

7           Well, no.  Excuse me.  Two front views, I

8  guess.

9      A.   That's two front views on that page.

10      Q.   Okay.  And then the next page, it says inside

11  stairway, and then the next one is rear?

12      A.   Yes.

13      Q.   Are those correctly identified?

14      A.   Yes.

15      Q.   Okay.  And the stairway, that's an exterior --

16  is that an exterior stairway down there where it's open

17  on either end of the building, the stairway is?

18      A.   The hallway is open on either end.  The

19  stairwell --

20      Q.   Yeah.  Yeah.  I'm sorry.  Okay.  You're

21  saying on either end of that hallway that the stairway

22  is open?

23      A.   Yes.

24      Q.   Okay.  And do you remember whether Mr. McNeal

25  actually went inside any of the apartments?  Do you

12

1    know?

2        A.   I would venture to say he didn't, but I don't

3    know that.

4        Q.   Okay.  All right.  My understanding is that he

5    did not and that the information about what I'm going

6    to ask you about what's inside came from you on a phone

7    call.

8        A.   Okay.

9        Q.   But I'll -- we'll get to that here in just a

10   minute.

11            Okay.  If you look at the next page, it has a

12   couple what looks like garages or Buildings 2 and 3.

13   Do you see that?

14       A.   Yes.

15       Q.   What are those?

16       A.   They were I think originally designed to be

17   storage units for the tenants.

18       Q.   Okay.

19       A.   We pretty much just used them for storage,

20   supplies for maintenance.

21       Q.   Okay.  And then the next page shows overgrown

22   bushes and then concrete blocks that are -- it says

23   craked, but I assume that meant cracked.

24       A.   Yes.

25       Q.   Okay.  All right.  Do these -- and then the

13

1   back page just shows the rear again of the building,

2   two pictures; is that right?

3       A.   Yes.

4       Q.   And then the next last page --

5       A.   Uhm --

6       Q.   Oh, sorry.  Go ahead.

7       A.   Yeah.  That is the rear.

8       Q.   Okay.  And then the last page is peeling paint

9   on the facia board.  Do you see that?

10      A.   Yep.

11      Q.   Okay.  All right.  Now, if you go back to the

12  front page underneath at the top of it, it says

13  recommendations.  Do you see that?

14      A.   Yes.

15      Q.   Okay.  So the first one here, he notes some

16  deficiencies.  And it's like it says -- oh, he notes

17  the cracks in the exterior wall of the garage and

18  storage buildings, trees touching the storage

19  buildings, a window on the main building is being

20  boarded over.  And then it suggests that a licensed

21  contractor should be retained to evaluate and repair

22  these deficiencies, the cracks in the concrete blocks

23  and mortar in both the garage and the buildings, and

24  the cracks -- excuse me -- on the west side of the

25  garage storage building.

14

```
 1              Did I read that, summarize that roughly?

 2       A.   I think so.

 3       Q.   Okay.  Did you -- were you aware of these

 4   suggestions that I just referred to in that paragraph?

 5       A.   I don't recall them, but I mean, I'm aware of

 6   the cracks in the walls, yes.

 7       Q.   Okay.

 8       A.   And I do remember going and trimming trees at

 9   some point because of insurance reasons.

10       Q.   Okay.  And do you recall taking -- doing these

11   -- do you recall whether or not these suggestions,

12   whether you completed or followed the suggestions and

13   did them?

14       A.   I never did anything with the cinder block

15   walls, no.

16       Q.   Okay.  But everything else?

17       A.   I would assume.  I've bought lots of windows

18   in my days, so I would assume that I replaced the

19   window.

20       Q.   Okay.

21       A.   I'm not -- I'm not even sure that the garages

22   were part of the insurance policy on that, so I'm not

23   sure it was even any of their concern.

24       Q.   Okay.  The next one has to do with smoke

25   detectors.  Let me just ask this generally:  Were there
```

15

1   smoke detectors inside the building at the time of this

2   inspection in '15?

3       A.   Yes.

4       Q.   Okay.  And were they -- do you recall whether

5   you specifically --

6       A.   Well, let me back up.  I assume there was

7   smoke detectors inside the building.  I can't -- I

8   mean, I didn't go in every apartment that day when he

9   did the inspection and verify.

10      Q.   Okay.

11      A.   But we were pretty adamant about keeping smoke

12  detectors within the building.

13      Q.   Okay.  So I guess as I sit here, their

14  recommendation -- let me ask it this way.  Scratch

15  that.

16           The second recommendation there marked, you

17  know, 5-2-2015, it says it recommends a maintenance

18  program should be implemented for the smoke detectors

19  with batteries being tested on a monthly basis and

20  batteries being completely replaced every six months.

21  Written documentation should be retained regarding

22  testing and replacement.

23           Did I read that correctly?

24      A.   I'm not reading it, but I would -- yes.  Yes.

25      Q.   Do you -- well, let me ask this:  Did you do

16

1   something?  Did you do that?  Did you implement a

2   program for the smoke detectors, replacing the

3   batteries and replacing any units and then documenting

4   it?

5       A.   Every time somebody moved out before somebody

6   moved in, we checked the smoke detectors, replaced the

7   smoke detector if it didn't work.

8       Q.   Okay.

9       A.   So, yes.  Yes.

10      Q.   Did you document that in some way?

11      A.   No, sir.

12      Q.   Okay.  All right.  Would you have -- I mean,

13  each time you did that would you have receipts or would

14  you use it -- you know, keep it for tax reasons or

15  anything like that?

16      A.   No, sir.

17      Q.   Okay.  Let me go to the last one here.  On the

18  -- it says all exterior having three or more steps

19  should be provided with handrails on both sides to

20  reduce the potential for falls.  Handrails, and it

21  gives a description of the height and length.

22          Did you do that?

23      A.   I don't know that I have any exterior stairs

24  with three or more steps, so I would say no.

25      Q.   Okay.  Would you call the stairway we were

17

```
 1    looking at in the picture an exterior stair or not?
 2         A.   No, sir.  That's an interior stair.
 3         Q.   Okay.
 4         A.   And we did install handrails there, actually,
 5    since you mentioned it.
 6         Q.   Yeah.  It looks like there's handrails on it.
 7         A.   It was in the picture.  There was handrails
 8    there.
 9         Q.   Okay.
10         A.   But that's an interior stairwell.  That's not
11    an exterior stairwell.
12         Q.   Okay.  Inside the building, okay, do you
13    access -- do people access their apartments through
14    doors that are inside off a hallway or are they
15    exterior?
16         A.   They're interior doors.
17         Q.   Okay.  So in the -- is there a common --
18    scratch that.
19              Is there a --
20         A.   Corridor?
21         Q.   -- interior corridor for the apartments?
22         A.   Yes, sir.
23         Q.   And that is interior; right?
24         A.   Yes, sir.
25         Q.   And then you have fire detection, fire/smoke
```

18

1    detectors in the hallway that was interior?

2        A.   There may have been one upstairs but I can't

3    -- I don't recall.  I don't know.  We had several

4    problems with people.  If you left anything where the

5    general public could get to it, it would walk off.

6        Q.   Okay.

7        A.   So I don't know if it was there at the time or

8    not, no.

9        Q.   Okay.  Do you recall replacing fire or smoke

10   detectors in the hallways between the apartments, you

11   know, where the people access their apartments from, do

12   you recall replacing the batteries in those?

13       A.   Me personally, no.

14       Q.   Or having someone doing it?

15       A.   I just got smoke detectors when I was told we

16   needed smoke detectors or batteries.

17       Q.   Do you have a property manager?

18       A.   I had a guy that lived there that took care of

19   everything, yes.

20       Q.   Okay.  And what was his name?

21       A.   Keith Crawford.

22       Q.   Okay.  Do you know if Keith Crawford is still

23   around or working with you?

24       A.   He's not in Oklahoma anymore.  He's moved to

25   Arkansas the last I knew.

1     Q.   Okay.  How long ago was that that he left?

2     A.   I would be guessing, but I would say -- what

3  is this?  I would say eight months.

4     Q.   Okay.  So he was there when the fire occurred?

5  Is that true?

6     A.   He was working for me then.

7     Q.   Okay.  Yeah.  Doesn't mean he was actually on

8  site, though; right?

9     A.   Yeah.  No.  Nobody was on site.

10     Q.   Okay.  And I'm getting to that.

11          Okay.  So Keith Crawford would have been --

12  would he have been, at that time of the fire, would he

13  have been working as a property manager for you or

14  doing odd jobs at the site?

15     A.   He was in the process of remodeling the

16  building.

17     Q.   Okay.  Okay.  Let's see.  The fire occurred

18  on, what, March 25th of 2020?  Is that right?

19     A.   I believe that's close.

20     Q.   Okay.  That's what I have here.

21     A.   That's what my pictures were dated.  I took

22  pictures of it the night of.

23     Q.   Okay.

24     A.   Or the morning of.

25     Q.   Have you provided those pictures to the

GL-001159

20

1    insurance company?

2        A.   I haven't ever talked to the insurance

3    company.

4        Q.   Ahh.  Okay.  Okay.  I'll get to that in just a

5    minute.

6            Okay.  On the smoke detectors, so if anyone --

7    is this accurate to say:  If anyone made sure that the

8    smoke detectors were, one, there either in the

9    apartment or in the hallways, and had fresh batteries,

10   would that have been Mr. Crawford?

11       A.   Yes, sir.

12       Q.   Okay.  And was he directed to take care of

13   that?

14       A.   Yes, sir.

15       Q.   Okay.  Sometimes you hire someone as property

16   man and they just know to do it.  I was just wondering

17   if you particularly directed, hey, you need to make

18   sure you --

19       A.   He was one you had to give pretty good

20   direction to.

21       Q.   Okay.  And you remember doing that?

22       A.   Oh, yes.

23       Q.   Okay.  All right.  How about fire

24   extinguishers?  Do you recall whether there were fire

25   extinguishers in the common area, the hallway?

21

```
 1        A.   Not the common area.

 2        Q.   Okay.

 3        A.   We kept fire extinguishers in the sinks -- or

 4   under the sinks in the kitchens.

 5        Q.   Of the apartments?

 6        A.   Yeah.  Like where you would keep one in your

 7   house.

 8        Q.   Right.

 9        A.   Yeah.

10        Q.   Okay.  And did you have a regular maintenance

11   program of some sort to make sure that they were still

12   there?

13        A.   That was one of the things we always checked

14   when people moved out.

15        Q.   Okay.  So it's when they moved out, you

16   checked that?

17        A.   Yes.

18        Q.   Would you make sure there was a fire

19   extinguisher there if it was missing for some reason?

20        A.   Yes.

21        Q.   Okay.  Okay.  Were there any other type of

22   fire protection devices that you feel were at the

23   apartment complex at the time of the fire other than

24   fire extinguishers or smoke detectors?

25        A.   I don't think so.  I don't know what other
```

22

1    types of fire devices there are.

2        Q.   Okay.  Do you believe at the time of the fire

3    that there was smoke detectors and fire extinguishers

4    in the apartments and in the hallways?

5        A.   I do not.

6        Q.   Okay.  Why do you think they were not?

7        A.   Because I directed Keith to remove them.

8        Q.   Okay.  And when did you direct Keith to remove

9    them?

10       A.   When we started gutting -- or cleaning out the

11   building to start remodel.

12       Q.   Okay.  And when was -- when was that?  When

13   did you gut the building to start remodel?

14       A.   Well, we never gutted it.  We started cleaning

15   it out, but that would have been, best estimate, first

16   part of February, 2020.

17       Q.   Okay.  So okay.  The first part of February.

18   Is there a way that you can identify the date where the

19   tenants were not in the building any longer and you --

20   maybe let me start with that; that you did not have any

21   more tenants living in the building.  During -- for

22   this remodel, I mean.  Sorry.

23       A.   I have a tenant that could tell me when he

24   moved out, which I believe would have been January 30th

25   or January 31st when I told them they had to be out.

23

1      Q.   Okay.

2      A.   And then there was another tenant there that

3   moved out a day or two after.

4      Q.   Okay.  Do you know the names of these tenants?

5      A.   The one that I talked to, his name is Keith

6   Alston.

7      Q.   And that's the one that you think would have

8   left on January --

9      A.   He left right at the end of January.

10      Q.   Okay.  So you're thinking he left by January

11   30th or 31st?

12      A.   I would say yes.

13      Q.   Okay.  And that's Keith Alston.  Do you have

14   any contact information for him?

15      A.   Yes.

16      Q.   Okay.  Would you mind providing that to us?

17      A.   No, sir.

18      Q.   Just through your counsel.

19      A.   Yeah.  He has it.  I've given it to him.

20      Q.   Oh, okay.

21          MR. JACKSON:  I was going to look.  I

22   think Josh's wife actually was able to find him and

23   sent that to me maybe last night or today.

24          MR. LINSCOTT:  Okay.  Okay.

25          MR. JACKSON:  I'll look for it and see.

24

1    BY MR. LINSCOTT:

2        Q.    (By Mr. Linscott)   What about the other one?

3    You said there was somebody else that may have still

4    been there?

5        A.    I don't know her name.  She lived above Keith

6    and I don't recall her name.

7        Q.    Okay.  Do you have any records that might show

8    when she left?  We're just -- all I'm looking to do is

9    try and establish when the last person was moved out

10   before the fire.

11       A.    No, sir.  I don't have any records of that.

12       Q.    Okay.  Okay.  Now, let me ask this:  Prior to

13   that -- okay.  How many apartments are there in that --

14   in that building?

15       A.    Eight.

16       Q.    Okay.  And when did you make the decision to

17   remodel the apartments?

18       A.    I don't know exact date.  It was something

19   that was in the process.  I mean, I'd been kicking it

20   around for some time and so I just -- it was just like,

21   all right, this is -- I don't know.  I guess I don't

22   know the date.

23       Q.    Okay.  And I guess I'm asking for

24   generalities.  And if you don't know, that's fine.

25   I'm just thinking was it like, you know, the last part

25

1    of 2019.  Was it January?  You know, I don't know.

2         A.    It had to of been towards the end of 2019.

3         Q.    Okay.

4         A.    Because I told those tenants they had to

5    leave, we were emptying the building for work.

6         Q.    Okay.  So did -- can you tell me that, you

7    know, by the -- oh, at some point in time, let's say by

8    January 1, how many apartments had people living in

9    them?

10        A.    By January 1?

11        Q.    January 1 of 2020.

12        A.    I would say four.

13        Q.    Okay.  And say by January 15th.

14        A.    Two.

15        Q.    Okay.  So of the eight apartments, two had

16   people in them and that's the two we're talking about,

17   right, Keith Alston and the woman who we can't -- we

18   don't know her name; right?

19        A.    Yes.

20        Q.    Okay.  Do you have any records that show that,

21   that it would be on or before January 15th?

22        A.    No.  The records are pretty -- no.  I don't.

23        Q.    Okay.  All right.  Do you recall whether any

24   of the windows were boarded up prior to the fire?

25        A.    I boarded up all the windows.

26

1      Q.   All of them were?

2      A.   Yes.

3      Q.   Okay.  And do you recall when that was done?

4      A.   I believe that I did that the first weekend in

5  February or maybe the last weekend in January.

6      Q.   Okay.

7      A.   And then all except for the one where the lady

8  was upstairs, I didn't board hers up because she was

9  still getting stuff out.

10     Q.   I see.

11     A.   She had moved out but she had -- she had so

12  much stuff in there.  Anyway, she was getting that

13  stuff out and so I left her windows unboarded.

14     Q.   Okay.

15     A.   Until she had moved out completely.

16     Q.   All right.  Did she live in that apartment by

17  herself?

18     A.   I believe she had maybe her daughter and a

19  child there.  I don't know.  I don't remember.

20     Q.   Okay.  Okay.  Well, let me ask about the fire.

21  Do you -- do you recall or do you have any -- scratch

22  that.  Let me think.

23          Do you know how the fire started?

24     A.   No.

25     Q.   Okay.  Have you talked to any fire inspectors

27

1    about the fire?

2        A.   The one the insurance adjuster sent.  Or not

3    the adjuster.  The insurance company, I guess.

4        Q.   Was that a company called Rimkus?

5        A.   I couldn't tell you.

6        Q.   Okay.

7        A.   It's been a year.

8        Q.   Right.  Do you remember his name, by chance?

9        A.   No.

10       Q.   Okay.  Did you talk to anyone with the fire

11   department here in Ponca City, or police about the

12   fire?

13       A.   The police -- so the night of the fire, of

14   course, I talked to some firemen.  I talked to a

15   detective a day or two after the fire.  But because of

16   COVID, I couldn't go to the police department and talk

17   to him about it.

18       Q.   Right.

19       A.   I don't recall if I ever talked to the fire

20   martial or fire chief about it at any time.  I don't

21   recall that.

22       Q.   Okay.

23       A.   I do remember talking to the fire investigator

24   because that job intrigued me.  I think it's an

25   interesting job, so I went to let him in and then

28

1    talked -- you know, I visited with him while he was

2    there.

3         Q.   Do you remember his name, by chance?

4         A.   No.

5         Q.   Okay.  Did he indicate to you what he thought

6    was the cause of the fire?

7         A.   I remember he had a general idea where he

8    thought the fire started.

9         Q.   Okay.

10        A.   And at that point I told him that I had a

11   heater that sat there, so he kind of maybe thought that

12   that was the cause of the fire.

13        Q.   Okay.  Do you recall that being near a

14   stairwell?

15        A.   Yes.

16        Q.   Okay.  All right.  I'm assuming nobody was

17   living there and so they didn't -- so no one got hurt

18   as a result of the fire.  Is that correct?

19        A.   Not that I'm aware of.

20        Q.   Okay.  How did you learn about the fire?

21        A.   My wife's friend came banging on my front door

22   at 1:00 in the morning or something.  I don't remember.

23        Q.   Okay.  I know there was some -- I think there

24   was some communications from Mr. Jackson to the

25   adjustor on your case about the building maybe possibly

29

```
 1    needing to be demolished or whatnot.  What's the status
 2    of the building now as we sit here?
 3        A.   It's sitting there.
 4        Q.   It's still there?  Okay.  The City or anyone
 5    hasn't pushed you to -- I used the word push.  It's
 6    probably not the right word. but asked you to tear it
 7    down?
 8        A.   They did push very hard.
 9        Q.   Okay.
10        A.   And Scott got them to back off.
11        Q.   Okay.
12        A.   It's, I think, $20,000 to demo the building.
13        Q.   Right.  Right.  And that's what I needed to
14    know.  Have you -- you answered it, but have you got an
15    estimate of some kind of demo'ing the building?
16        A.   Yeah.  About $20,000.
17        Q.   Okay.  And do you know whether or not the
18    insurance company has any figures on that for demo'ing
19    the building?
20        A.   Never heard from them.
21        Q.   Okay.  Well, that's -- yeah.  Let me ask just
22    a couple questions about that.  I'm mainly interested
23    in the claim itself and the property, but have you had
24    any communications with the insurance company by
25    telephone?
```

30

```
 1        A.    The insurance company, not that I -- not that
 2   I recall.
 3        Q.    Okay.  Well, or someone on their behalf?
 4        A.    I've talked to an insurance adjuster.
 5        Q.    Do you remember his name?
 6        A.    No.
 7        Q.    Was it a Kevin Wilson, by chance?
 8        A.    That sounds familiar.
 9        Q.    Okay.  All right.  And can you give me an idea
10   of the substance of those conversations?  I'm not
11   trying to get specifics down to each one, but what you
12   remember of them.
13        A.    Me asking him why I wasn't hearing anything.
14        Q.    Okay.
15        A.    Him telling me that -- I think he sent me an
16   email maybe, I don't remember, that basically they
17   didn't know if they were going to pay the claim.  I
18   asked him if I needed to get my attorney involved.
19        Q.    Okay.
20        A.    He told me no, that I didn't need to do that.
21        Q.    Okay.
22        A.    I would just be wasting my money.  And I got
23   -- I got kind of heated and I said my attorney is the
24   type of attorney that's going to do it and for way more
25   than what the claim is, and then he's going to get his
```

1    cut.

2          So I felt like I was being taken advantage of,

3    I guess.

4      Q.   Okay.  When was the last time that you talked

5    with either Kevin or anyone else from the insurance

6    company other than me here today?

7      A.   My guess would have been May.

8      Q.   May?

9      A.   Would be my guess.

10     Q.   Okay.  And then other than that,

11   though, Mr. Jackson has had some communications with

12   them.  Are you aware of that?

13     A.   Yes.

14     Q.   Okay.  All right.

15     A.   I believe.

16     Q.   I mean, other than me.

17     A.   No.  I mean, I know that Scott had emailed

18   them and hadn't had any responses and then finally got

19   a response here just recently.

20     Q.   Okay.  Were you -- are you aware of any

21   requirements -- not requirements.  Let me scratch that.

22          Are you aware of provisions in the insurance

23   policy regarding, you know, smoke detectors and fire

24   extinguishers and that sort of thing?

25     A.   It was listed in a letter that I received,

32

1    yes.

2        Q.    Okay.  And the letter, would that have been

3    back at the time of the policy issuance or after you

4    made the claim?

5        A.    After I made the claim.

6        Q.    Might have been called something like a

7    reservation of rights?

8        A.    Yes.  Yeah.

9        Q.    Okay.  All right.  And so that -- but prior to

10   that, were you aware of that type of language in the

11   policy, you know, at the time that you purchased the

12   policy?

13       A.    If you're asking me if I read the policy, no.

14       Q.    Okay.  All right.  Let me ask -- okay.  Let me

15   ask the same type of questions about vacancy.

16            Okay.  Were you aware of there being issues --

17   not issues but provisions in the policy that relate to

18   coverage in times of remodeling or vacancy and that

19   kind of thing?

20       A.    After I received the letter of reservations.

21       Q.    Okay.  But not before?

22       A.    Not before.

23       Q.    Okay.  Did those subjects at all -- scratch

24   that.

25            Did you -- when you got the policy, did you

33

1    get that through an agent?

2       A.   Yes, sir.

3       Q.   Okay.  Tell me -- remind me the name of the

4    agent.   Swords?

5       A.   Originally it was Swords.  Yes.

6       Q.   Okay.  We talked about his name.  And then now

7    is it someone -- would it have been someone different

8    prior to the fire?

9       A.   Kevin Randall, I believe is his name.

10      Q.   Kevin Randall.  Okay.  Did they at any point

11   explain to you generally -- well, not generally.

12   Scratch that.

13          Did they explain to you the terms of the

14   policy, about you know, what it covered and what it

15   wouldn't cover and that kind of thing?

16      A.   No, sir.

17      Q.   Okay.  And did they -- did you ever have

18   questions you asked of them about coverage that you --

19   that they didn't answer?  So I mean, my point there is

20   did you ask something and then they didn't get back to

21   you on it?

22      A.   No.  I mean, I don't think so.

23      Q.   Okay.  All right.  Let me get back to the

24   fire.  You say a neighbor kind of came and got you, you

25   know, and told you about the fire occurring at the

34

```
 1   time?
 2        A.   It wasn't a neighbor.  It was my wife's
 3   friend.
 4        Q.   Oh, okay.  I apologize.  So did you go down
 5   there then?
 6        A.   Oh, yes.
 7        Q.   Okay.  Was there already fire and police
 8   there?
 9        A.   It was -- yeah.
10        Q.   They were there?
11        A.   Yeah.
12        Q.   Okay.  All right.
13        A.   My wife's friend saw on Facebook Live.
14        Q.   Okay.
15        A.   And so I had -- I turn my phone on silent when
16   I go to bed at night and so they called me like 25
17   times and I didn't answer.
18        Q.   Okay.
19        A.   And so that's why they came to my house.
20        Q.   Have you had a fire there before?
21        A.   Yes.
22        Q.   Okay.  Do you recall when that was?
23        A.   Right after I bought the building, I believe.
24        Q.   Was it like 12 years ago, 11 years ago,
25   something like that?
```

 1      A.   Probably something like that.

 2      Q.   Again, I need to let you finish first before I

 3   start talking again.

 4      A.   And I'm not even sure if I -- I don't know if

 5   it's when I owned the building or it's when me and my

 6   business partners owned the building before.

 7      Q.   Okay.

 8      A.   Somebody had set some trash on fire in the

 9   stairwell.  It wasn't much of a fire.  It was more of a

10   nuisance.

11      Q.   Okay.  Did you have a claim for that?

12      A.   Oh, yes.

13      Q.   Okay.  And was it the same insurance company?

14      A.   I don't recall.

15      Q.   Same policy?

16      A.   I would assume so.

17      Q.   You think it was the same -- well, scratch

18   that.

19           You think it was the same agent and --

20      A.   I don't recall.

21      Q.   Don't recall.  Okay.  So when you first owned

22   the building, it was with other -- you had business

23   partners in it?

24      A.   Yes, sir.  We had a corporation.

25      Q.   Okay.  And did you ultimately wind up the sole

36

1    owner of the building?

2        A.   Yes, sir.

3        Q.   Do you recall when that year was, what year

4    that would be?

5        A.   2011-ish.  Ish.

6        Q.   Okay.  Okay.  So that's like ten years from

7    now.  Nine years before the fire that we're here on?

8        A.   I think.  I don't -- don't hold me to that.

9        Q.   Okay.  Okay.  Did the -- let me -- I may have

10   asked this a moment ago, but when you talked with the

11   fire inspectors, did they -- the one that was with the

12   -- I guess it's the City, right, Ponca City?

13       A.   Uh-huh.

14       Q.   You have you to say yes or no.

15       A.   Oh, when I talked to the fire inspector for

16   Ponca City?

17       Q.   He was with Ponca City, right, and you did

18   talk to him?

19       A.   When?

20       Q.   At some point.

21       A.   I don't know.

22       Q.   Well, we talked about it a minute ago.  Let me

23   get us back to that.  When did you -- when did you

24   first talk with the inspector from Ponca City, fire

25   inspector?

37

1      A.   I don't know that I did.

2      Q.   Okay.  I misunderstood you.  I thought you

3   said that you did.

4      A.   I don't think so.

5      Q.   Okay.  You thought he had an interesting job?

6      A.   That was the one the insurance guy sent.

7      Q.   Oh, okay.  Okay.  That was confusing.

8      A.   No.  That was the one the insurance guy sent

9   or the insurance company sent.

10     Q.   Okay.  So you don't recall ever talking to

11  anyone from the City fire department about this?

12     A.   I don't recall that.

13     Q.   Okay.  Okay.  Did the police take a statement

14  from you?

15     A.   They did not.

16     Q.   Okay.  And obviously you would remember if it

17  was someone with the fire department?  They didn't take

18  a statement from you?

19     A.   Not that I recall.

20     Q.   Okay.  All right.  Do you know whether

21  Mr. Crawford was there the night of the fire?

22     A.   Not that I'm aware of.

23     Q.   Okay.  Do you know whether he was interviewed

24  by the police or the fire department in their

25  investigation?

38

1      A.   Not that I'm aware of.

2                MR. LINSCOTT:  Okay.  Okay.  All right.

3      Okay.  Let's take a short break because I want to move

4      on to another area and then we won't have that much

5      more.

6                MR. JACKSON:  Sounds good.

7                (A brief recess was here had.)

8      BY MR. LINSCOTT:

9      Q.   Okay.  Mr. Fields, let me ask a couple

10     questions back on this Exhibit 1.  If you'll look on

11     page -- I think it's Page 2, the second page of it, I

12     think I asked you earlier about providing any

13     information in a phone call.  And I think you weren't

14     sure, you didn't remember it specifically?

15     A.   Phone call with who?

16     Q.   The gentleman that did this inspection.

17     A.   Oh, this guy?

18     Q.   Excuse me.  Yeah.  Jack McNeal.  If you'll

19     look at the third page, rather, there it has a heading

20     that says Protection.  Do you see that?

21     A.   Yes.

22     Q.   Okay.  And remember, this would have been

23     somewhere around, you know, May through July is the

24     time frame of 2015.  And it asks -- it says currently

25     tagged fire extinguishers, yes.

1          Do you recall telling Mr. McNeal that there

2     were currently tagged fire extinguishers in the

3     facility?

4          A.   I don't know if I said tagged, but if he would

5     have asked, I would have told him there was fire

6     extinguishers, yes.

7          Q.   Okay.  And it says building contains fire

8     detection system, and it says no.

9          Do you recall that being the case or telling

10    Mr. McNeal that?

11         A.   I don't -- I don't recall that, but I probably

12    would have told him that there was not a fire detection

13    system, yes.

14         Q.   Okay.  Do you include smoke detection in fire

15    detection in your mind?

16         A.   Not as a system, no.

17         Q.   Okay.  So that wouldn't be inquiring to you

18    whether there were smoke detecters?

19         A.   No.  But I stated right down there that there

20    was smoke detectors.

21         Q.   Right.  That's what I'm trying to see, because

22    here it says no.

23         A.   I'm in the construction industry, so to me a

24    smoke detection system is when a fire detection company

25    comes in, puts them everywhere, runs wires and

40

1    everything is integrated and it calls the fire

2    department.  That's a fire detection system to me.

3        Q.   Okay.  Okay.  All right.  I can see that.

4    That may be actually the case.  So down in the comment

5    area, again, just review that.  And is this -- do you

6    recall providing that information to the inspector or

7    that it's consistent with what your understanding was

8    at the time?  Under the comments it says there are fire

9    extinguishers and smoke detectors in all units

10   according to the owner.  Is that true at the time?

11       A.   I don't recall saying that, but that's pretty

12   accurate.  It sounds like exactly what I would say.

13       Q.   All right.  It says the fire extinguishers and

14   smoke detectors are maintained and inspected by the

15   maintenance man at the time of new tenants moving in

16   and out, which is consistent with what you said a

17   moment ago.  Is that correct?

18       A.   That's correct.

19       Q.   Okay.  And the smoke detectors are all battery

20   operated.  All right.  The information on the special

21   hazards, does that look like information that you would

22   have provided to him or that was consistent with what

23   you believe was the case at the time?

24       And I'll read it.  It says:  There are personal

25   grills for cooking on the premises.  The policy is that

41

1    grills must be at least ten feet from the building when

2    being used.

3         A.   Are you asking if I told him that?

4         Q.   Right.

5         A.   I mean, that's what we told everybody, yes.

6         Q.   Okay.  And that was the case at the time;

7    true?

8         A.   I'm sorry.  I don't understand.

9         Q.   This was true at the time here in 2015?

10        A.   That we told people to keep their grills away

11   from the building?

12        Q.   Well, yes, or that you provided that

13   information to the inspector.

14        A.   Oh.  I assume that I did.  I mean, that's what

15   he said I said.

16        Q.   Okay.  All right.  Okay.  Let me ask you a few

17   names here.  Let me find a name here.  Do you recall

18   visiting with a Detective Brian Dye?

19        A.   Yes.

20        Q.   Okay.  Do you know Mr. Dye?

21        A.   Yes.

22        Q.   Okay.  I mean, you knew him prior to the fire

23   and after, I assume.

24        A.   Oh, yes.  Small town.

25        Q.   Exactly.  Okay.  How many people are in Ponca

42

1   City?

2        A.   25,000=ish.

3        Q.   25,000?

4        A.   Yeah.

5        Q.   Okay.  I lived for a time in Vinita, which is

6   about 5,000.  And yes.  Everyone knew everybody.

7        A.   We're not quite that small.  But no.

8   I visited with Brian Dye on more than one occasion

9   about things.

10        Q.   Okay.  Mr. Dye indicated that he did not

11   observe -- if he indicated that he did not observe any

12   smoke alarms throughout the building or fire

13   extinguishers, would he be wrong, after the fire?

14   Right after the fire?

15        A.   I would say he is probably correct.

16        Q.   Okay.  Because they were all pulled out?

17        A.   Yes, sir.

18        Q.   Because of the remodel?

19        A.   Yes, sir.

20        Q.   Okay.  Do you recall a padlock being on a rear

21   door of the apartment complex?

22        A.   That's how we secured it, yes.

23        Q.   Okay.  Do you remember whether -- did you ever

24   learn that that padlock had been cut prior to the fire?

25        A.   I learned or I was told by somebody that -- or

43

1    maybe I saw it, but I don't know that it was cut.

2        Q.   My bad.  I assumed.  It says broken.  Was

3    broken prior to?

4        A.   I believe, and I don't know that this is

5    correct, but I believe the hasp had been pried off of

6    the wall.  I believe that I had seen that, but I didn't

7    know.  I mean, I don't know that -- who did it.

8        Q.   Okay.

9        A.   Maybe the fire department, but maybe not

10   because somebody had to -- I mean, somebody got in the

11   building, obviously.

12       Q.   Okay.  Okay.  And was -- and help me with

13   this.  Mr.- -- I think it's Crawford.  Is that the

14   maintenance man?

15       A.   Yes.

16       Q.   Was he -- he was still working for you for

17   that apartment complex at the time --

18       A.   Yes.

19       Q.   -- of the fire?

20       A.   Yes.

21       Q.   Okay.  Okay.  Did you happen to ask him or

22   know from some experience when was the last time he was

23   there at the apartment complex before the fire?

24       A.   I don't recall.  I would -- I would assume

25   that he had been there earlier that day working, but

44

1    it's been long enough that I don't know and he could

2    have been at another job working that day.

3        Q.   Because he was doing the remodeling; right?

4        A.   On that building, but he did some other stuff

5    too.

6        Q.   Okay.  And then how long after the fire did he

7    move away?

8        A.   Oh, months.  He continued to work for my

9    stepfather on his ranch.

10       Q.   Okay.  Okay.  So he did all kinds of jobs

11   then?

12       A.   Yeah.  This guy has worked for me forever.  I

13   mean, for over a decade.

14       Q.   Okay.  All right.  And do I remember this

15   right that you may have contact information for him or

16   not?

17       A.   I have a phone number.  I don't know that -- I

18   don't know that it's good.

19       Q.   We talked about that earlier with your

20   counsel.

21       A.   I haven't tried to call him.

22       Q.   Forgive me.  I went back over that ground one

23   time before.

24            Let me look at this and we may be close.

25            I asked you, I think, Mr. Fields, about a

45

```
 1    prior fire and a prior claim.  Did you have any other
 2    claims on that property, property claims?
 3         A.   Not that I recall.  Not that I recall.
 4         Q.   You said that you've had -- we talked a little
 5    bit about some communications with Kevin Wilson, we
 6    think, but with the adjuster?
 7         A.   Yes.
 8         Q.   The adjuster from Great Lakes Insurance
 9    Company?
10         A.   Yeah.
11         Q.   Did -- did you provide him with any lists of
12    any items that are particularly needed to be replaced
13    other than the building itself, like contents of some
14    kind or any claims related to that?
15         A.   I don't believe I did, but I don't believe I
16    had contents insurance.  It's a rental property.
17         Q.   Okay.  So was there any other -- other than
18    the property loss itself, the building, was there any
19    other claim that you were making as a result of the
20    fire?
21         A.   I don't think so.
22         Q.   That you made?  Okay.
23         A.   I don't think so.
24         Q.   Did you make the claim through your agent?
25         A.   Yes.
```

46

1     Q.   Okay.  And then he made the claim through to

2   Great Lakes, and then from there it went on.  Right?

3     A.   I don't know how that took place.  I just told

4   my insurance agent we had a problem.

5     Q.   Okay.  Are you aware of any other -- scratch

6   that.

7          We talked a moment ago about the City wanting

8   to tear down the building; right?

9     A.   Yes, sir.

10    Q.   Okay.  And that your attorney has stopped that

11  for the moment?

12    A.   Yes, sir.

13    Q.   Is there anything else like that that is

14  causing an issue with you with either the City or

15  someone else from the standpoint of causing you harm or

16  damage in some way?

17    A.   I'm not sure that I understand the question.

18    Q.   I mean covered by the policy.  Okay?  If you

19  know.

20         So let me ask that a little better than that.

21  In your mind, the building is covered under the policy;

22  right?

23    A.   Yes, sir.

24    Q.   Because of the fire?

25    A.   Yes, sir.

47

1      Q.   Is there some other type of claim that you

2    think is covered under the policy as you sit here?  I'm

3    not locking you into it one way or the other.

4    I'm just asking you if you --

5      A.   I don't think so.  Not that I'm aware of.

6      Q.   Okay.  Okay.  I'll give you an example.  There

7    are some policies -- and I'm not saying one way or the

8    other on this one.  But there are some policies that

9    you have a loss of income.

10     A.   Loss of rent.  I got you.

11     Q.   And that kind of thing.

12     A.   I don't believe that I have that.  I don't

13   believe that I have that coverage.  I don't know why I

14   would have.  I'm not -- it wasn't a concern of mine, so

15   I don't think I do.

16     Q.   Okay.  But it's not -- there isn't something

17   else you've raised to the insurance company?  And

18   again, I'm not saying you have to.  But I'm just asking

19   if there was something else that you've raised with

20   them.

21     A.   No.  I don't think so.

22     Q.   Okay.  Has -- we've talked about you talking

23   with the one fire inspector that came out with the --

24     A.   Yes, sir.

25     Q.   Okay.  Have you provided any -- has anyone

48

1   else come and asked you questions about what happened

2   with the fire other than what we've covered here today?

3   For example, news people or some other company for some

4   reason?

5          A.   I don't believe so.

6                MR. LINSCOTT:  Okay.  Well, I think I'm

7   done.  I think I'm done.

8                MR. JACKSON:  Okay.  No questions here.

9                MR. LINSCOTT:  Thank you for your time.

10               (Proceedings ended at 11:11 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

49

1                          C E R T I F I C A T E

2

3

4
STATE OF OKLAHOMA     )
5                            )    ss.
COUNTY OF KAY         )
6

7

8               I, Sonya Kay Meneely, Certified
Shorthand Reporter within and for the State of
9    Oklahoma, do certify that the foregoing proceedings
were taken at the time and place herein named; that the
10   transcript is a true record of the proceedings as
reported by me and thereafter transcribed into
11   typewriting by computer.

12               I do further certify that I am not
counsel, attorney, or relative of either party, or
13   clerk or stenographer of either party or of the
attorney of either party, or otherwise interested in
14   the event of this suit.

15               IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal at my office in Ponca City,
16   Kay County, Oklahoma, this 1st day of April, 2021.

17

18

19                            _____
                             SONYA KAY MENEELY, CSR
20                           Scribe Reporting Service
                             PO Box 2534
21                           Ponca City, Oklahoma  74602

22

23

24

25

**RRI**
RELIABLEREPORTS.COM

# Limited Multi-Peril Survey

If you have any questions
about this report please
contact Customer Care at
1-800-460-0723 ext. 707.

| | | | |
|---|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name: M. J. Kelly of ARKANSAS - 202 | |
| Name: | Joshua Fields | Agt Name: Zac Swords | Code: |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com | Date: 05/11/2015 |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 | |
| State: | OK  Zip: 74601   Coverage: $325,450.00 | Inspected By: McNeal, Jack | Date: 05/20/2015 |

## Recommendation(s)

**2015-5-01**
CH-2 During our survey there were deficiencies noted with the property. These included the following:
Cracks in the exterior wall of the garage/storage buildings. Trees touching the storage buildings need to be
trimmed. A window on the main building has been boarded over. A licensed contractor should be retained
to evaluate and repair these deficiencies. There are cracks in the concrete blocks and mortar in both of the
garage or storage buildings. The cracks are in the west side garage/storage building on the north and south
ends.

**2015-5-02**
A maintenance program should be implemented for the smoke detectors, with batteries being tested on a
monthly basis and the batteries being completely replaced every six months. Written documentation should
be retained regarding testing and replacement.

**2015-6-03**
All exterior stairs having three or more steps should be provided with handrails on both sides to reduce the
potential for falls. Handrails should be 34" to 38" in height with vertical members having no greater width
than 4".

### FOR COMPLETION BY THE INSURED:

By signing this form, I ___Josh  Fields___ (print name), certify that all

required recommendations found during the recently conducted inspection have

been fully complied with as of ___7/23/15___ (date).

X _____
(Insured - Signature)

___7/22/15___
Date Signed



EXHIBIT
PENGAD 800-631-6989

This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc. All Rights Reserved.          *** *see comments*

GL-001190



# Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | | |
|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name:   M. J. Kelly of ARKANSAS - 202 |
| Name: | Joshua Fields | Agt Name:   Zac Swords |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 |
| State: | OK  Zip: 74601   Coverage: $325,450.00 | Inspected By:  McNeal, Jack |

Code:

Date: 05/11/2015

Date: 05/20/2015

## Operations

| | |
|---|---|
| *Who was Interviewed:* | Mr. Joshua Fields- owner |
| *Type of Occupancy:* | Lodging |
| *Years in Business:* | 10 yrs. |
| *Hours of Operation:* | 24/7 |
| *Gross Receipts:* | $27,300 |
| *Insured is Building Owner or Tenant* | Owner |

*Comment*

The property is owned and managed by Mr. Joshua Fields. He has owned the property for approximately 10 years. The property consists of 8 apartments. One of the apartments is the residence for his full time maintenance man. The maintenance main pays no rent as part of his wages for maintaining the property. The annual gross receipts are approximately $27,300 dollars.

## Premises

| | |
|---|---|
| *Construction:* | Frame |
| *Roof Type:* | Shingles,Fiberglass |
| *Building Age:* | 55 yrs old |
| *Number of Stories* | 2 |
| *Type of Heating:* | Central |
| *Type of Fuel:* | Gas |
| *Is It Vented:* | Yes |
| *Type of Wiring: (by interview)* | Copper |
| *Wiring Updates:* | Yes *** |
| *Any Unsafe Wiring Noted:* | No |
| *Condition of Building:* | Fair *** |
| *Housekeeping:* | Good |
| *Square Footage:* | 7,200 sq. ft. |

*Comment*

The main building is two story of frame construction, with a brick veneer exterior. The building is approximately 55 years old. It is 7200 sf. There is central gas heating in the units, with window air conditioning. The wiring is all copper, and was completely updated in 2011.  The building is noted to be in fair condition due to a boarded window on the rear of this building.

There are two joisted masonry structure used as garage/storage units in the rear of the property. They are 1257 sf and 1210 sf.  They are noted to be in fair condition due to cracks in the exterior walls.  Also there are trees touching the buildings.

This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.          *** *see comments*
GL-001191



# Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | |
|---|---|
| Ref #: | 13009450   Policy #: CP00058570 |
| Name: | Joshua Fields |
| Location: | 410 W Cleveland |
| City: | PONCA CITY |
| State: | OK  Zip: 74601   Coverage: $325,450.00 |

Client Name:  M. J. Kelly of ARKANSAS - 202
Agt Name:  Zac Swords
Requested By: jbetts@mjkellyar.com
Effective Inception/Renewal Date: 01/01/1900
Inspected By:  McNeal, Jack

Code:
Date: 05/11/2015

Date: 05/20/2015

## Protection

| | |
|---|---|
| *Is Building In City Limits:* | Yes |
| *Distance to Fire Hydrant:* | 0-500 |
| *Distance to Fire Department:* | 0-3 miles |
| *Currently Tagged Fire Extinguisher(s):* | Yes |
| *Building Contains Fire Detection System:* | No |
| *Building Contains Sprinkler System:* | No |
| *Burglar Alarm System:* | No |
| *If Yes, Is it monitored by central station:* | No |

*Comment*

There are fire extinguishers, and smoke detectors in all units, according to the owner.  The fire extinguishers and smoke detectors are maintained and inspected by the maintenance man at the time of new tenants moving in, or out. The smoke detectors are all battery operated.

## Special Hazards

| | |
|---|---|
| *Any Special Hazards: (If Yes Explain)* | Yes *** |

*Comment*

There are personal grills for cooking on the premises. The policy is that grills must be at least 10 feet from the building when being used.

## Liability

| | |
|---|---|
| *Exit Doors Swing Outward:* | No *** |
| *Lighted Exit Signs:* | No |
| *Emergency Lights:* | No |
| *Floors Free of Disruptions:* | Yes |
| *Any Stairs Present:* | Yes *** |
| *If Yes, Interior/Exterior:* | Interior |
| *If Yes, Condition:* | Good |
| *Exterior Trip or Fall Hazards:* | No |
| *Condition of Parking Lot:* | Good |
| *Exterior Lighting:* | Good |

*Comment*

The exit doors pen inward. There are interior stairs leading to the second floor. The stairs appear to be in good condition and equipped with a handrail, however there are no vertical members.  There is an emergency exit on the second floor that leads to a fire escape.

This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015        © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.

*** see comments

GL-001192



# Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | | |
|---|---|---|
| Ref #: | 13009450 | Policy #: CP00058570 |
| Name: | Joshua Fields | |
| Location: | 410 W Cleveland | |
| City: | PONCA CITY | |
| State: | OK  Zip: 74601  Coverage: $325,450.00 | |

Client Name:  M. J. Kelly of ARKANSAS - 202
Agt Name:  Zac Swords
Requested By: jbetts@mjkellyar.com
Effective Inception/Renewal Date:  01/01/1900
Inspected By:  McNeal, Jack

Code:
Date: 05/11/2015

Date: 05/20/2015

## Note(s)

Front



## Note(s)

Front



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.

*** see comments
GL-001193



# Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | | | |
|---|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name:  M. J. Kelly of ARKANSAS - 202 | Code: |
| Name: | Joshua Fields | Agt Name:   Zac Swords | |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com | Date: 05/11/2015 |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 | |
| State: | OK  Zip: 74601   Coverage: $325,450.00 | Inspected By:  McNeal, Jack | Date: 05/20/2015 |

## Note(s)

Inside stairway



## Note(s)

Rear



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.

*** see comments
GL-001194



## Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | | | |
|---|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name: M. J. Kelly of ARKANSAS - 202 | |
| Name: | Joshua Fields | Agt Name: Zac Swords | Code: |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com | Date: 05/11/2015 |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 | |
| State: | OK  Zip: 74601   Coverage: $325,450.00 | Inspected By: McNeal, Jack | Date: 05/20/2015 |

### Note(s)

Building 2



### Note(s)

Building 3



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.

*** see comments
GL-001195



## Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| Ref #: | 13009450 | Policy #: CP00058570 |
| Name: | Joshua Fields | |
| Location: | 410 W Cleveland | |
| City: | PONCA CITY | |
| State: | OK   Zip: 74601   Coverage: $325,450.00 | |

Client Name:   M. J. Kelly of ARKANSAS - 202
Agt Name:   Zac Swords
Requested By: jbetts@mjkellyar.com
Effective Inception/Renewal Date: 01/01/1900
Inspected By:  McNeal, Jack

Code:

Date: 05/11/2015

Date: 05/20/2015

### Note(s)

Overgrown bushes rear west side garage



### Note(s)

Craked concrete blocks west side garage



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015          © Copyright 2002 Reliable Reports of Texas, Inc. All Rights Reserved.

\*\*\* *see comments*
GL-001196



## Limited Multi-Peril Survey

If you have any questions about this report please contact Customer Care at 1-800-460-0723 ext. 707.

| | | | |
|---|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name: | M. J. Kelly of ARKANSAS - 202 |
| Name: | Joshua Fields | Agt Name: | Zac Swords |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com | Code: |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 | Date: 05/11/2015 |
| State: | OK  Zip: 74601   Coverage: $325,450.00 | Inspected By: McNeal, Jack | Date: 05/20/2015 |

### Note(s)

Rear



### Note(s)

Rear



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015         © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.

*** see comments
GL-001197



**Limited Multi-Peril Survey**

If you have any questions
about this report please
contact Customer Care at
1-800-460-0723 ext. 707.

| | | | |
|---|---|---|---|
| Ref #: | 13009450   Policy #: CP00058570 | Client Name: M. J. Kelly of ARKANSAS - 202 | Code: |
| Name: | Joshua Fields | Agt Name:   Zac Swords | Date: 05/11/2015 |
| Location: | 410 W Cleveland | Requested By: jbetts@mjkellyar.com | |
| City: | PONCA CITY | Effective Inception/Renewal Date: 01/01/1900 | |
| State: | OK   Zip: 74601   Coverage: $325,450.00 | Inspected By:  McNeal, Jack | Date: 05/20/2015 |

## Note(s)

Peeling paint all fascia



This report is made from limited observation and information that may have been obtained in whole or in part, from third parties. Reliable Reports, Inc. ("Reliable") disclaims any responsibility for, and assumes no liability as a result of, inaccuracies or misinformation received by Reliable from third party sources. Any replacement cost valuations contained in this report are prepared using software and replacement cost information provided by third parties. No warranty, express or implied, is made as to the accuracy or completeness of any replacement cost valuation. This report is not performed as an undertaking on behalf of, or for the benefit of, the named insured or others. By accepting this report, the requesting company, its reinsures and its clients agree to hold Reliable free and harmless from any claims or liability whatsoever.

Tuesday, June 23, 2015   © Copyright 2002 Reliable Reports of Texas, Inc.  All Rights Reserved.   *** *see comments*
GL-001198